**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| M2M SOLUTIONS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-202-LPS-CJB |
| | ) | |
| AMAZON.COM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Presently pending before the Court is Defendant Amazon.com, Inc.'s ("Defendant" or

"Amazon") motion to dismiss for failure to state a claim (the "Motion"), filed pursuant to Federal

Rule of Civil Procedure 12(b)(6). (D.I. 10) Defendant argues that Plaintiff M2M Solutions

LLC's ("Plaintiff" or "M2M") asserted United States Patent Nos. 8,504,007 (the "'007 patent"),

8,577,358 (the "'358 patent"), and 8,577,359 (the "'359 patent") (collectively, the "asserted

patents" or the "patents-in-suit") are directed to non-patent-eligible subject matter pursuant to 35

U.S.C. § 101 ("Section 101"). For the reasons that follow, the Court recommends that

Defendant's Motion be DENIED, in the manner further described below.

## I. BACKGROUND

### A. Factual Background

The three asserted patents in this action, each entitled "System and Method for Remote

Asset Management[,]" are related and they share a common specification. (D.I. 1, exs. A-C; *see

also* D.I. 11 at 4; D.I. 15 at 2 & n.1) They are among a family of patents that concern machine-

to-machine ("m2m") communication systems. (D.I. 15 at 2 n.1; D.I. 36 (hereinafter, "Tr.") at 51)

All three claim priority to Application No. PCT/GB03/02171, filed on May 21, 2003, which is

now United States Patent No. 7,027,808.

In general, "wireless [m2m] applications have historically involved systems in which various types of technical equipment wirelessly connected to communications networks have been monitored, and to varying degrees managed, by remote computer server platforms." (D.I. 1 at ¶ 9) The patents purport to disclose a system and method "for providing a range of consumer services by autonomously monitoring and managing consumer device assets[.]" ('007 patent, cols. 25:2-4, 27:10-12) The system features "a plurality of consumer device assets" which are registered to a remote computer server platform. (*Id.*, Abstract)[1] The remote computer server platform of the invention executes software to monitor and manage the consumer device assets. (*Id.*) The consumer device assets automatically "communicate operational status information and consumer usage information to the remote computer server platform[,]" which then automatically processes that information "according to preprogrammed conditions." (*Id.*) Based on the results of processing "at least some of the received consumer usage information, the remote computer server platform manages the consumer device assets by communicating management instructions that cause the stored data content files of one or more of the assets to be automatically modified." (*Id.*)

It is undisputed that the three patents' claims share substantial similarities, as "each [patent] contains a total of thirty asserted claims having subject matter that is similar across like numbered claims, except that the '007 patent is drafted as systems claims, the '358 patent as method claims, and the '359 patent as apparatus claims." (D.I. 15 at 2-3; *see also* D.I. 11 at 5 n.2

---

[1]    In its Complaint, M2M asserts that such "consumer devices assets" can consist of e-reader devices, tablets, smart phones, and computers. (D.I. 1 at ¶ 15; Tr. at 11)

("The claims of the '007 patent are system versions of the '358 patent method claims. The claims of the '359 patent are a subset of the '007 claims that recite only the server platform elements.")) Thus, the parties agree that for present purposes, "the elements of the '358 patent claims can be treated as fully analogous to the elements of like-numbered claims in the '007 and '359 patents." (D.I. 11 at 5 n.2) Below in Section III the Court will further describe relevant claims at issue, using the claims of the '007 patent as exemplary claims.[2]

## B.     Procedural Background

M2M commenced this patent infringement action on February 28, 2017 (D.I. 1) Chief Judge Leonard P. Stark thereafter referred the case to the Court to resolve any and all matters with regard to scheduling, as well as any motions to dismiss, stay and/or transfer venue. (D.I. 5)

Amazon filed the instant Motion in lieu of answering on April 21, 2017, (D.I. 10), and briefing was completed on June 2, 2017, (D.I. 16).[3] Thereafter, M2M filed a notice of supplemental authority, calling to the Court's attention the recent decision of the United States Court of Appeals for the Federal Circuit in *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017). (D.I. 33) The Court held oral argument on the Motion on September 21, 2017.

---

[2]      In light of the parties' agreement that the eligibility of the claims across the relevant patents rise and fall together, the Court will, for simplicity's sake, only cite to the '007 patent going forward, unless otherwise noted. Additionally, when the Court refers to "the patent," "the patent specification," "the patent claims," or the "system" claims, that is a reference to the '007 patent, unless otherwise noted. But the Court's findings applicable to the '007 patent (and its system claims) are also meant to apply equally to the claims of the other two patents (and their similar method/apparatus claims).

[3]      M2M filed a motion seeking leave to file a sur-reply brief ("Motion for Leave") on June 12, 2017, (D.I. 18), and briefing was completed on July 3, 2017, (D.I. 20). The Court DENIED Plaintiff's Motion for Leave during the oral argument on the instant Motion. (Tr. at 107-08)

(D.I. 36)  Thereafter, Amazon also filed a notice of supplemental authority.  (D.I. 42)

## II.   STANDARD OF REVIEW

### A.   Standard of Review Regarding a Rule 12 Motion that Challenges Patent Eligibility Pursuant to Section 101

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on the failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted).

Here though, this Rule 12(b)(6) Motion is used to assert an affirmative defense—that the patents are subject matter ineligible under Section 101.  In that scenario, dismissal is permitted only if the well-pleaded factual allegations in the Complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007); *Bristol-Myers Squibb Co. v. Merck & Co., Inc.*, Civil Action No. 15-560-GMS, 2016 WL 1072841, at *1 n.1 (D. Del. Mar. 17, 2016); *Genetic Techs. Ltd. v. Agilent Techs., Inc.*, 24 F. Supp. 3d 922, 927 (N.D. Cal. 2014).

4

Patentability under Section 101 is a question of law. *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd, Bilski v. Kappos*, 561 U.S. 593 (2010). Yet this question of law is also one that "may be informed by subsidiary factual issues." *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012) (citing *In re Comiskey*, 554 F.3d 967, 976 (Fed. Cir. 2009)).

There has been some uncertainty regarding the appropriate standard of proof in Section 101 cases, specifically as to whether a "clear and convincing" standard of proof applies. *See Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 379-80 (D. Del. 2015) (citing cases), *aff'd in part, rev'd in part*, 838 F.3d 1307 (Fed. Cir. 2016). However, assuming that the "clear and convincing" standard of proof applies to Section 101 challenges (as the Court does here), *see Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1342 (Fed. Cir. 2013) (internal quotation marks and citation omitted) ("[A]ny attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence."), *vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 134 S.Ct. 2870 (2014), it applies only to the resolution of factual disputes, and not to resolution of pure issues of law, *see MAZ Encryption Techs. LLC v. Blackberry Corp.*, C.A. No. 13-304-LPS, 2016 WL 5661981, at *4 (D. Del. Sept. 29, 2016); *TriPlay, Inc. v. WhatsApp Inc.*, Civil Action No. 13-1703-LPS, 2015 WL 1927696, at *5 (D. Del. Apr. 28, 2015) (citing cases), *adopted in all substantive respects*, 2015 WL 4730907 (D. Del. Aug. 10, 2015). And as to the instant Motion, which was filed at the pleading stage (a stage at which any facts of record that are clearly in dispute are to be construed in the light most favorable to the plaintiff), the "clear and convincing" standard of proof should not come into play at all. *See Blue Spike, LLC v. Google Inc.*, Case No. 14-cv-01650-YGR, 2015 WL 5260506, at *4 (N.D. Cal. Sept. 8, 2015); *Shortridge v. Found. Constr. Payroll Serv., LLC*, Case No. 14-cv-

5

04850-JCS, 2015 WL 1739256, at *7 (N.D. Cal. Apr. 14, 2015); *Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7-8 (C.D. Cal. Mar. 17, 2015); *cf. Modern Telecom Sys. LLC v. Lenovo (United States) Inc.*, Case No.: SA CV 14-1266-DOC (JEMx), 2015 WL 7776873, at *5 (C.D. Cal. Dec. 2, 2015).

### B.  Assessing Patentable Subject Matter

Patent-eligible subject matter is defined in Section 101 of the Patent Act:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101.  In choosing such expansive terms "modified by the comprehensive 'any,' Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980).

Yet while the scope of Section 101 is broad, there is an "important implicit exception [to it]: [l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks and citation omitted); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012). "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, [because] they are the basic tools of scientific and technological work." *Prometheus*, 566 U.S. at 71 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

The Supreme Court of the United States has also recognized, however, that "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Id.*; *see also Alice*, 134 S. Ct. at 2354.  This is because "all inventions at some level embody, use, reflect, rest upon, or

apply laws of nature, natural phenomena, or abstract ideas." *Prometheus*, 566 U.S. at 71; *see also Alice*, 134 S. Ct. at 2354. To that end, it has explained that "an *application* of a law of nature, [natural phenomena or abstract idea] to a known structure or process may well be deserving of patent protection." *Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (emphasis in original).

In *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), the Supreme Court provided the framework for assessing whether a patent contains eligible subject matter under Section 101. Under this now familiar two-step process, courts "must first determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice*, 134 S. Ct. at 2355. If so, the courts must then determine "[w]hat else is there in the claims" by considering "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (internal quotation marks and citation omitted). The Supreme Court describes this test as a search for an "inventive concept"—"*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (internal quotation marks and citation omitted).

**C.** **Considerations Relevant to Deciding a Rule 12 Motion that Challenges the Eligibility of Multiple Patent Claims, Based on the Analysis of a Single Representative Claim**

In *Cronos Techs., LLC v. Expedia, Inc.*, C.A. No. 13-1538-LPS, 2015 WL 5234040 (D. Del. Sept. 8, 2015), Chief Judge Stark noted "several considerations relevant to deciding a Rule 12 motion that challenges the patent eligibility of multiple patent claims based on analysis of a

single representative claim." *Cronos Techs., LLC*, 2015 WL 5234040, at *2. The District Court

set out these considerations as follows:

> First, are all non-representative claims adequately represented by
> the representative claim (i.e., do *all* of the challenged claims relate
> to the *same* abstract idea and do any of the non-representative
> claims add one or more inventive concepts that would result in
> patent eligibility)?[] Second, are there issues of claim construction
> that must be decided before resolving the motion? Finally, is there
> *any* set of facts that could be proven relating to preemption,[]
> questions of patentability,[] or whether the claims "solve a
> technological problem,"[] that would result in a determination that
> one [] or more of the claims are patent-eligible?

*Id.* (emphasis in original) (citations and footnotes omitted); *see also Yodlee, Inc. v. Plaid Techs.*

*Inc.*, Civil Action No. 14-1445-LPS, 2016 WL 2982503, at *3 (D. Del. May 23, 2016), *adopted*

*by* 2017 WL 385039 (D. Del. Jan. 27, 2017).

**D.     Need for Claim Construction**

There is no hard-and-fast rule that a court must construe terms in the claims at issue

before it performs a Section 101 analysis. *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of*

*Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion

that claim construction is not an inviolable prerequisite to a validity determination under

[Section] 101."). In some cases, claim construction is unnecessary because it is not disputed that

the Section 101 eligibility decision does not turn on disputes regarding claim construction. *See,*

*e.g., Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x. 988, 991-93 & n.1 (Fed.

Cir. 2014) (holding that a patent claim was subject matter ineligible under Section 101, where the

district court did not engage in claim construction, but where the plaintiff "d[id] not explain

which terms require construction or how the analysis would change"). In other cases, such as

when a Section 101 motion would be well-taken even were a plaintiff's proposed claim construction to be accepted, a court may simply adopt the plaintiff's construction (or the construction most favorable to the plaintiff) for the purposes of the motion. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *Genetic Techs. Ltd. v. Lab. Corp. of Am. Holdings*, Civil Action No. 12-1736-LPS-CJB, 2014 WL 4379587, at *5-6 (D. Del. Sept. 3, 2014) (citing cases). Alternatively, the Court may decline to rule on a Rule 12 motion prior to engaging in the *Markman* process, *see, e.g.*, *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 835 (E.D. Tex. 2014) (Bryson, J., sitting by designation), or may deny the motion if it appears there are potential constructions of key claim terms that, if adopted, would render the claims subject matter eligible, *see Execware, LLC v. BJ's Wholesale Club, Inc.*, C.A. No. 14-233-LPS, 2015 WL 5734434, at *2-5 (D. Del. Sept. 30, 2015).

## III.   DISCUSSION

M2M alleges infringement of the three asserted patents, each of which, as noted above, has essentially the same 30 claims; two of those claims (claims 1 and 20) are independent claims. (D.I. 1 at ¶¶ 19, 27, 35; *see supra* pp. 2-3)  All 90 of the claims are put at issue by the Motion. (D.I. 11 at 1 ("[A]ll claims of the asserted patents are directed to patent-ineligible subject matter under 35 U.S.C. § 101."))

In its Complaint, M2M references dependent claims 10 and 27 as "representative claims" of the patents-in-suit.  (D.I. 1 at ¶ 12)  Because of this, Amazon directs the Court to rely on claims 10 and 27 in making a determination of patent eligibility under Section 101 for *all* of the

claims of the three patents. (D.I. 11 at 16-17)[4] M2M, for its part, "disputes [the idea] that the Complaint's allegation that [c]laims 10 and 27 are 'representative' relative to the particular claimed technology features being discussed therein somehow constitutes an admission of the same for the wholly distinct purpose of the Court's present Section 101 determinations." (D.I. 15 at 20 n.6 (citations omitted))

In the end, this dispute about "representative" claims is not going to matter much. Because both parties primarily discussed claims 10 and 27 in their briefs, (D.I. 11 at 4-16; D.I. 15 at 5 n.2; *see also id.* at 5-19), because both of those claims also incorporate the contents of the two independent claims in the patents, and in light of the Court's ultimate decision (which is to deny the Motion), the Court need only focus on those two claims below. Put differently, in determining that the Court cannot now find claims 10 and 27 patent ineligible as a matter of law, the Court is necessarily also determining that it cannot find the remaining claims of the patents-in-suit ineligible at the pleading stage.

Claim 10 is dependent upon claim 9, which in turn is dependent on independent claim 1. These claims, as set out in the '007 patent, recite:

> **1.** A system for providing a range of consumer services by autonomously monitoring and managing consumer device assets, said system comprising:
>
> a plurality of consumer device assets wirelessly connected to one or more communications networks, each asset having operating system and application software, nonvolatile memory for storing files of data content for display to a consumer user of the device, and a display apparatus for displaying the stored data content;

---

[4]     Nevertheless, in an effort to cover all of its bases, Amazon also briefly addresses the remaining claims and whether they add an inventive concept. (D.I. 11 at 17-19)

a remote computer server platform connected to the one or more communications networks, the remote computer server platform configured to execute software applications for monitoring and managing the plurality of consumer device assets, each of the plurality of consumer device assets being registered with the remote computer server platform;

the plurality of consumer device assets and the remote computer server platform being configured to communicate over the one or more communication networks via transmissions including at least one selected from the group consisting of General Packet Radio Service (GPRS) data messages, Enhanced Data rates for GSM Evolution (EDGE) data messages, and other packet switched data messages;

the plurality of consumer device assets being configured to communicate *operational status information* and *consumer usage information* to the remote computer server platform *automatically* as a result of at least one selected from the group consisting of pre-programmed conditions and instructions received from the remote computer server platform;

the remote computer server platform *being configured to receive and process the operational status information and the consumer usage information* of the plurality of consumer device assets automatically according to preprogrammed conditions; and

the remote computer server platform *being configured to communicate, based upon the results of processing at least some of the received consumer usage information, one or more management instructions that cause the stored data content files of one or more of the plurality of consumer device assets to be automatically modified.*

**9.** A system according to claim **1** wherein the remote computer server platform is configured to store information indicative of preferences that one or more individual consumer users of the plurality of consumer device assets have for particular data content files.

**10.** A system according to claim **9** wherein, the remote computer server platform is configured to further communicate, based upon the results of processing at least some of the consumer preference

11

information, one or more additional management instructions that
cause the stored data content files of one or more of the plurality of
consumer device assets to be automatically modified.

('007 patent, cols. 25:2-43, 26:15-26 (emphasis added))

Claim 27 is dependent upon claim 26, which in turn is dependent upon independent claim

20. Claim 27 is nearly identical to claim 10. The two claims are different in that claim 20

includes an additional limitation requiring the remote computer server platform to be configured

to send a Short Message Service ("SMS") message to at least one consumer device, in order to

power the device up so that more communications between the asset and the server can take

place. (*Id.*, col. 27:61-67) Additionally, the claim requires further configuration in the remote

computer server platform, as it (1) adds a second plurality of consumer device assets and (2)

limits the "communications network" the server and consumer asset devices can communicate

over to the "cellular mobile telecommunications network" and "the Internet." (*Id.*, cols. 27:10-

27, 28:33-44) Claim 27 (and claims 20 and 26 from which it depends) recites as follows (with

content italicized to the extent that it is different from that of claim 10):

> **20.** A system for providing a range of consumer services by
> autonomously monitoring and managing consumer device assets,
> said system comprising:
>
> a *first plurality* of consumer device assets wirelessly connected to a
> *cellular mobile telecommunications network*, each asset having
> operating system and application software, nonvolatile memory for
> storing files of data content for display to a consumer user of the
> device, and a display apparatus for displaying the stored data
> content;
>
> a *second plurality* of consumer device assets wirelessly connected
> to *the Internet*, each asset having operating system and application
> software, nonvolatile memory for storing files of data content for
> display to a consumer user of the device, and a display apparatus for

displaying the stored data content;

a remote computer server platform *connected to the cellular mobile telecommunications network and to the Internet*, the remote computer server platform configured to execute software applications for monitoring and managing the first and second pluralities of consumer device assets, each of the pluralities of consumer device assets being registered with the remote computer server platform;

the *first and second pluralities* of consumer device assets and the remote computer server platform being configured to communicate over the *cellular mobile telecommunications network and the Internet* via transmissions including at least one selected from the group consisting of General Packet Radio Service (GPRS) data messages, Enhanced Data rates for GSM Evolution (EDGE) data messages, and other packet switched data messages;

the *first and second pluralities* of consumer device assets being configured to communicate operational status information and consumer usage information to the remote computer server platform automatically as a result of at least one selected from the group consisting of pre-programmed conditions and instructions received from the remote computer server platform;

the remote computer server platform being configured to receive and process the operational status information and the consumer usage information of the *first and second pluralities* of consumer device assets automatically according to preprogrammed conditions;

the remote computer server platform being configured to communicate, based upon the results of processing at least some of the received consumer usage information, one or more management instructions that cause the stored data content files of one or more of the *first and second pluralities* of consumer device assets to be automatically modified; and

*the remote computer server platform being configured to communicate a Short Message Service (SMS) message to at least one of the first plurality of consumer device assets that causes one or more components of said asset to power up from a powered down state for facilitating the exchange of further communications between said asset and the remote computer server platform.*

13

**26.** A system according to claim **20** wherein the remote computer server platform is configured to store information indicative of preferences that one or more individual consumer users of the *first and second pluralities* of consumer device assets have for particular data content files.

**27.** A system according to claim **26** wherein, the remote computer server platform is configured to further communicate, based upon the results of processing at least some of the consumer preference information, one or more additional management instructions that cause the stored data content files of one or more of the *first and second pluralities* of consumer device assets to be automatically modified.

(*Id.,* cols. 27:10-67, 28:33-44)

### A. *Alice*'s Step One

Under step one of *Alice*, the claims are considered in their entirety to ascertain not simply whether they *involve* a patent-ineligible concept, but whether "'their character as a whole is directed to excluded subject matter'" (here, an abstract idea). *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)). "The 'abstract ideas' category embodies 'the longstanding rule that [a]n idea of itself is not patentable.'" *Alice*, 134 S. Ct. at 2355 (quoting *Gottschalk*, 409 U.S. at 67) (certain quotation marks omitted). An abstract idea can be, but need not amount to, a "preexisting, fundamental truth" about the natural world "that has always existed," or a "method of organizing human activity" (such as a "longstanding commercial practice"). *Id.* at 2356 (internal quotation marks and citations omitted); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256-57 (Fed. Cir. 2014); *cf. CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (explaining that a claim directed to an

abstract idea is one directed to a "'disembodied' concept . . . a basic building block of human ingenuity, untethered from any real-world application") (citation omitted). Beyond that, the concept of an "abstract idea" has not been crisply defined, *see Alice*, 134 S. Ct. at 2357 (declining to "labor to delimit the precise contours of the 'abstract ideas' category"), and the Supreme Court and the Federal Circuit have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases, *see Enfish*, 822 F.3d at 1334.

At step one, courts look to whether the claims "focus on a specific means or method[, . . .] or are instead directed to a result or effect that itself is the abstract idea[.]" *McRo, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). Put differently, courts are to assess whether the "claims do no more than describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem." *Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016).

Amazon asserts that claims 10 and 27 do not contain any such "limiting detail" and that instead, they are simply directed to the abstract idea of "receiving, storing, processing, and modifying information[.]" (D.I. 16 at 3; *see also* D.I. 11 at 9, 10; Tr. at 12-13) And so, the first question for the Court is whether "receiving, storing, processing, and modifying information" is, in fact, an abstract idea under the law.

The Court agrees that it is. That concept—without more—appears to implicate an idea that is "devoid of a concrete or tangible application[,]" *Ultramercial, Inc.*, 772 F.3d at 715, or "untethered from any real-world application[,]" *CLS Bank Int'l*, 717 F.3d at 1286. Indeed, M2M does not really dispute that if the claims *were* "directed to" this concept, then they would be

15

directed to an abstract idea.

But M2M does not, in fact, agree that claims 10 and 27 are directed to the idea of simply "receiving, storing, processing, and modifying information." And so next, the Court attempts to assess whether they are or not.

In order to attack that problem, the Court needs to understand M2M's view as to what the claims *are* directed to—and why M2M thinks that this concept amounts to a sufficiently specific, particularized solution to a problem in the realm of m2m communications. In its briefs, M2M seemed to take a kind of kitchen sink approach, pointing to a large number of "claimed mechanisms" that were said to either amount to or contribute to a "specific type of technology-based consumer service." (D.I. 15 at 16)

In this Report and Recommendation, however, the Court will focus on the aspects of the claims that received the lion's share of M2M's attention during oral argument—and that seem most favorable to M2M for purposes of this Motion. The representative claims each require, as set out above, not simply that the claimed systems and methods "receive," "process" and "modif[y]" "information" generally—but instead that: (1) the sever obtains, *inter alia*, "consumer usage information" from consumer device assets; and (2) based upon on the results of the processing of at least some of that consumer usage information; (3) the server communicates one or more management instructions to the assets; (4) that in turn causes "stored data content files" in the assets to be automatically modified.[5] M2M's view is that the invention at issue (an

---

[5]     As was noted above, the claims also state that, in addition to consumer usage information, the server additionally receives and processes "operational status information." (*See, e.g.*, '007 patent, col. 25:26-34) However, the management instructions communicated back to the consumer device assets are based on the processing "of at least some of the received consumer usage information[,]" not the operational status information. (*Id.*, col. 25:38-43)

16

"improved wireless m2m system") "serves in a novel capacity as a consumer services platform[,]" (D.I. 15 at 3 (emphasis omitted))—and at oral argument M2M explained that this was in significant part due to the invention's "capability to generate consumer usage information indicative of how the consumer was making use of that asset and then to autonomously report it back to the computer server platform[,]" (Tr. at 52). (*See also* D.I. 1 at ¶ 12; D.I. 15 at 3-4; Tr. at 58-60)) According to M2M, consumer usage information is a "very specific kind of information" that "was not collected and understood by consumer device assets in the prior art" until the disclosed invention changed the status quo. (Tr. at 52) For ease of reference, the Court will below use the phrase "consumer usage information solution" to refer to the invention's utilization of consumer usage information to generate management instructions resulting in modified data content files in consumer device assets.[6]

So, then, the next question is whether the representative claims are "directed to" a sufficiently specific consumer usage information solution, as opposed to the broader abstract idea set out by Amazon. How does a court figure out what a claim is "directed to"? The Federal Circuit's decision in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) provided

---

"Operational status information" is not mentioned in the Complaint at all. And M2M's answering brief concerns itself primarily with the claims' utilization of consumer usage information. (*See* D.I. 1 at ¶ 12; D.I. 15 at 3-4) Thus, the Court will not further focus on the claims' use of operational status information herein.

[6]     In its briefing, M2M also focused on some other aspects of claims 10 and 27 in explaining why the claims passed Section 101 muster. These included: (1) the claims' utilization of "consumer preference information," ('007 patent, cols. 26:20-26, 28:38-44; *see also* D.I. 15 at 4 (citing D.I. 1 at ¶ 12)); and (2) claim 27's use of SMS messages to cause the consumer device assets to power up, so that further communications may be processed, (D.I. 15 at 4-5 (citing D.I. 1 at ¶ 13)). Pursuant to its prior statements above and because it is not necessary to do so in order to resolve the Motion, the Court will not address those further aspects of the inventions herein.

help on this front.

In *Enfish*, the Federal Circuit deemed the claims at issue to be patent eligible because they recited "non-abstract improvements to computer technology[.]" *Enfish*, 822 F.3d at 1335, 1339. The patents at issue in *Enfish* claimed a particular type of logical model for a computer database, described as a "self-referential" table. The Court explained that for claims directed to software, the pertinent step one inquiry asks whether the "focus" of the claims "is on the specific asserted improvement in computer capabilities or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at 1335-36. As for the specific claims before it, the *Enfish* Court found that their "plain focus" was on a specific improvement to the way computers operate. *Id.* at 1336. In reaching this conclusion, the Court emphasized that the claims did not broadly cover *any* form of storing tabular data, but rather specifically taught the *self-referential* table for a computer database. *Id.* at 1337. This specificity was reflected in the claim language (which described, in some detail, the table's attributes), but also in the teaching of the specification. *Id.* The specification emphasized how the self-referential table improved upon conventional database structures (e.g., by providing increased flexibility, faster search times, and smaller memory requirements). *Id.* In light of what this demonstrated about the "plain focus" of the claims, the *Enfish* Court found that the claims passed *Alice*'s step one test. Thus, *Enfish* teaches that, in applying an *Alice* stage-one filter to a claim, a court should, in addition to looking at the claim language, also inquire into the specification's description of "the focus of the claimed advance over the prior art[.]" *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375-76 (Fed. Cir. 2016) (internal quotation marks and citation omitted) (*quoted in Enfish*, 822 F.3d at 1335); *see also, e.g., MAZ Encryption Techs. LLC*, 2016 WL 5661981, at *7

18

(noting that it is "plain from the reexamination prosecution history (with support in the specification) that the two-table limitations added during reexamination are sufficiently important that they must be included in any accurate description of the nature of claim 31 as a whole").

*Enfish* also explained that, in some cases involving computer-related claims, "there may be close calls about how to characterize what the claims are directed to[.]" *Enfish*, 822 F.3d 1339. In such circumstances, the *Enfish* Court stated, "an analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two" of the *Alice* test. *Id.*; *see also BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (finding that the claims and specific limitations did not readily lend themselves to a step-one finding that they are directed to a non-abstract idea, and deferring "consideration of the specific claim limitations' narrowing effect for step two").

Here, the Court will assess the relevant claim limitations at issue at step two. It does so because it is a "close call" as to whether the claims are directed to the asserted abstract idea (as opposed to a non-abstract consumer usage information solution, or something else).

On the one hand, it is true that some substantial part of the claims at issue are dedicated to describing the aspects of the consumer usage information solution. And (as will be set out further below in the step two analysis), there are also portions of the specification that describe that solution, and seem to articulate how it was a step forward over what was known in the art.

But, on the other hand, there is surely evidence to support Amazon's position. The claims—at least when read at a somewhat high level—describe a way of receiving, storing, processing, and modifying information. Additionally, although the claims do set out the use of

19

particular kinds of information to make a certain type of change to the content of consumer device assets, it is also true that in describing how all that is to happen, they do not contain an overwhelming amount of particularity. Moreover, the nature of the patents' specification makes it a bit hard to figure out what, exactly, the claims are truly "directed to." In part, that is because most of the specification is devoted to a description of other network elements or system embodiments that are not at issue here—such as the lengthy description of a "wireless module," which is claimed only in earlier members of the patent family. (D.I. 11 at 7; *see also* '007 patent, cols. 13-21; D.I. 15 at 5; Tr. at 6)[7] And the specification is also laden with many paragraphs that describe various other "need[s]" that the invention might address, or various other "object[s]" of the described invention, that do not seem to directly relate to the consumer usage information solution. ('007 patent, cols. 1-11)

For all of these reasons, the Court moves on to step two of the *Alice* inquiry.

## B.    *Alice*'s Step Two

The Supreme Court has explained that step two of the *Alice* framework asks whether the claims contain an "inventive concept," meaning "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (internal quotation marks and citation omitted). The purpose of the "inventive concept" requirement is to "ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Id.* at 2357 (internal

---

[7]      As Amazon points out, (Tr. at 6-7), at least some portions of the Background of the Invention section of the specification state that at least one way the inventions described therein build upon existing technology is by way of the utilization of this unclaimed wireless module. ('007 patent, cols. 1:54-60, 4:66-5:9)

quotation marks, citation, and brackets omitted).

Neither "limiting the use of an abstract idea to a particular technological environment[,]" nor simply stating an abstract idea and adding the words "apply it with a computer[,]" will transform an abstract idea into a patent-eligible invention. *Id.* at 2358 (internal quotation marks and citations omitted). And the additional elements within the claim, apart from the abstract idea itself, must involve more than "'well-understood, routine, conventional activit[ies]' previously known to the industry." *Id.* at 2359 (quoting *Prometheus*, 566 U.S. at 73); *see also Prometheus*, 566 U.S. at 82 ("[S]imply appending conventional steps, specified at a high level of generality, to . . . abstract ideas cannot make those . . . ideas patentable."). The *Alice* Court held that, based on these principles, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. Instead, claims relating to computer functionality must provide "a specific technical solution beyond simply using generic computer concepts in conventional way." *BASCOM*, 827 F.3d at 1352; *see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1302 (Fed. Cir. 2016) (examining at step two whether the claim described a "technical improvement over prior art technologies and served to improve the performance of the [computer] system itself").[8]

---

[8]     The Federal Circuit has also noted that the Section 101 inquiry and considerations relating to invalidity (e.g., "'the [Section] 102 novelty inquiry'") "'might sometimes overlap.'" *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) (quoting *Prometheus*, 566 U.S. at 90); *see also Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F. App'x 1001, 1005 (Fed. Cir. 2017) ("Th[e] threshold level of eligibility is often usefully explored by way of the substantive statutory criteria of patentability, for an invention that is new, useful and unobvious is more readily distinguished from the generalized knowledge that characterizes ineligible subject matter."); *Internet Patents*, 790 F.3d at 1347 (explaining that "pragmatic analysis of [Section] 101 is facilitated by considerations analogous to those of [Sections] 102 and 103 as applied to the particular case"). That said, the Federal Circuit has also explained that the Section 101 inquiry is not one focused on novelty, and that "[t]he novelty of any element or steps

Amazon argues that the claims' references to the consumer usage information solution do not amount to invocation of an inventive concept—that is, that the claims contain no sufficiently "specific technical solution" to a problem in the communications realm. (D.I. 11 at 14-16; D.I. 16 at 8) For purposes of the Motion, Amazon acknowledges M2M's characterization that the claims cover consumer devices that collect and send certain information, and a server that has been programmed to monitor and manage those devices in a certain way. (D.I. 16 at 8) But Amazon asserts that the claims still fail step two because "the asserted patents contain absolutely no disclosure of [any] 'specific programming' needed to achieve the claimed results"—in that the "claims do not provide any detail as to *how* the consumer devices collect or send information—they just say the devices *do*" and that the "claims do not state *how* the server processes this information, just that it *does*." (*Id.* (emphasis in original))

The Court determines, however, that when considering the facts in the light most favorable to M2M, it cannot now conclude that the claims are patent ineligible. The Court comes to this conclusion (one that, it acknowledges, was a difficult one) for the following three reasons.

---

in a process, or even of the process itself, is of *no relevance* in determining whether the subject matter of a claim falls within the [Section] 101 categories of possibly patentable subject matter." *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016) (emphasis in original) (certain internal quotation marks and citation omitted); *see also Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339-40 (Fed. Cir. 2017) (affirming district court's rejection of evidence related to novelty and nonobviousness because it was not relevant to the question of patent-eligibility under Section 101). The Court understands the combined effect of this case law to mean that the fact that a claimed solution may be new or novel does not, in and of itself, mean that the claim is non-abstract, since "a claim for a *new* abstract idea is still an abstract idea." *Synopsys, Inc.*, 839 F.3d at 1151 (emphasis in original). But, on the other hand, the fact that a claimed solution is different than, and perhaps narrower or more nuanced than, what was known in the art can be relevant to questions that *do* bear on eligibility—such as whether the claims contain detail that is more than the appending of generic, conventional computer technology to an abstract idea, or whether the claimed solution would unduly preempt a broad range of potentially patentable activity in a given field.

First, there is evidence in the patents suggesting that the consumer usage information

solution amounts to a specific technological step forward in the realm of m2m communication

systems, one that does not amount simply to using generic computer concepts in a conventional

way. *BASCOM*, 827 F.3d at 1350-51. The patents' Abstract devotes a significant portion of its

sole paragraph to highlighting the importance of the invention's utilization of consumer usage

information to generate management instructions that, in turn, cause the modification of stored

data content files of consumer device assets. ('007 patent, Abstract) And then, in further listing

one of the many asserted improvements over the prior art embodied by the invention, the patent

states as follows:

> In a further area of application, consumers would benefit from a
> system, which gathered data according to the use of a particular
> asset and forwarded this data to a remote server for the purpose of
> optimising the asset and for designing an appropriate range of
> services to support the said use of the asset. For example, any
> communication device which comprised a range of options such as
> pull down menus for internet or dedicated service access might be
> improved if the range of options were prioritised automatically
> according to the way the user preferred to use the device or in the
> order of access of mostly used features.

(*Id.*, col. 3:55-65; *see also id.*, cols. 10:59-11:3 (noting that it "is a further object of the present

invention" to provide this type of improved system); D.I. 15 at 4, 6; Tr. at 52-53, 59-60)[9] This

passage, which the Court must credit at the pleading stage, indicates that the computer

---

[9]     During oral argument, M2M's counsel pointed out that this portion of the
specification provides an example of what the use of the consumer usage information solution
would look like, explaining that in such a scenario the device is "in essence . . . spying on the
behavior of the consumer, taking note of how he was using [a] particular drop down menu and
then report[ing] back to the . . . remote computer server platform [that] would generate a
management instruction to make a specific kind of change to the asset that would be a benefit to
the consumer." (Tr. at 53-56; *see also id.* at 67)

23

technology relating to such a system was not being utilized at the time of the patent application. (Tr. at 52); *cf. MAZ Encryption Techs. LLC*, 2016 WL 5661981, at *5 (finding that with regard to a Section 101 motion brought at the pleading stage, "the Court must take the specification's statements about the purported invention to be true" and was "not free to accept Defendant's contrary attorney argument that [the claim at issue] is directed to a 'conventional' way of transparent encryption"). And that, in turn, it tends to contradict Amazon's assertion that the claims at issue "merely recite the abstract idea of using a generic set of *conventional components in conventional ways* for receiving, storing, processing, and modifying information[.]" (D.I. 11 at 16 (emphasis added)) It thus appears plausible that there are a "set of facts that could be proven relating to preemption[10 and also as to] whether the claims 'solve a technological problem,'[] that would [ultimately] result in a determination that one [] or more of the claims are patent-eligible[.]" *Cronos Techs., LLC*, 2015 WL 5234040, at *2.

Second, despite Amazon's position to the contrary, the claims are not totally bereft of *any*

---

10      The Supreme Court has declared that the "concern that drives th[e] exclusionary principle [i]s one of pre-emption." *Alice*, 134 S. Ct. at 2354; *see also Bilski*, 561 U.S. at 612 (explaining that if a claim is so abstract so as to "pre-empt use of [the claimed] approach in all fields, and would effectively grant a monopoly over an abstract idea[,]" such a claim is not patent-eligible); *BASCOM*, 827 F.3d at 1350 (finding claims not to be patent ineligible at step two in part because they did not "preempt all ways of filtering content on the Internet; rather, they recite a specific, discrete implementation of the abstract idea of filtering content"). The Federal Circuit has also noted, however, that simply because a claim does not *completely* preempt use of an idea, that does not mean that the claim is patent eligible. *See FairWarning IP, LLC v. Iatric Sys, Inc.*, 839 F.3d 1089, 1098 (Fed. Cir. 2016) ("While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility.") (internal quotation marks and citation omitted). To the extent that the claimed system implements a solution in the realm of m2m communications that was new and sufficiently discrete, it may not unduly preempt a significant number of m2m communication methods that involve receiving, storing, processing, and modifying information. The record would benefit from further amplification as to this issue, so that a full and fair determination can be made at the summary judgment stage.

specificity. Put differently, if the question here is "How do the claims suggest that the system receive, store, process, and modify information?" then the claims can be read to provide at least "one level of 'how'" that is to be done. *Int'l Bus. Machs. Corp. v. The Priceline Grp. Inc.*, Civil Action No. 15-137-LPS-CJB, 2016 WL 626495, at *13 (D. Del. Feb. 16, 2016) (citing cases). The remote computer sever recited in the claims does receive particular types of information (consumer usage information,[11] and, additionally, operational status information) from the consumer device assets, and it also uses the consumer usage information to make a "specific kind of modification to the [consumer device] asset"—i.e., one that causes a modification of stored data content files in the asset. (Tr. at 60; *see also id.* at 62-63 (M2M's counsel arguing that the modification is "limited to one particular kind of file, which is the file that's storing . . . content that's shown on the display to the consumer, [one of] millions of different changes [that could be made] to a consumer electronic product [and one directed to] only that one particular type of file on the product and nothing else"); *id.* at 65, 83)

Now, Amazon is correct that the claims also include reference to certain computer hardware that does not appear to require any unique physical structure (e.g., "consumer device assets" or a "remote computer server platform"). (D.I. 11 at 5, 14-16; Tr. at 11)  And it is also correct that the claims are otherwise short on any second-level description of *how* the server is to be specifically programmed to implement the consumer usage information solution (e.g., how the

---

[11]     M2M's counsel suggested at oral argument that consumer usage information means information "indicative of the manner in which the consumer has made use of the device[.]" (Tr. at 58)  The Court does not believe (nor have the parties suggested) that the particular construction given to this term makes a meaningful difference in the resolution of this Motion, but the Court will consider M2M's proposal to be the meaning that should be ascribed to the term for purposes of this Motion.

server actually processes the consumer usage information, or how the server actually generates management instructions used to modify content). (D.I. 11 at 5-7, 10-11; Tr. at 14, 17, 19, 22-23, 26) But though these realities may ultimately help Amazon win the day at summary judgment, the Court cannot say that, in light of what the claims *do* recite, it is clear that Amazon should prevail at the pleading stage.

Third, the supplemental authority cited by M2M supports the Court's decision. In *Visual Memory*, the Federal Circuit found that the claims at issue were not directed to an abstract idea, but rather were directed to a specific "technological improvement: an enhanced computer memory system." *Visual Memory*, 867 F.3d at 1259. The patent at issue described prior art computer memory systems that "were designed and optimized based on the specific type of processor selected for use in that system." *Id.* at 1255. This deficiency necessitated either designing a different memory system for each type of processor (which was expensive) or using a processor not designed for a particular system (which decreased efficiency). *Id.* The patent purported to overcome these prior art "deficiencies by creating a memory system with programmable operational characteristics that [could] be tailored for use with multiple different processors without the accompanying reduction in performance." *Id.* The representative claim at issue recited only:

> 1. A computer memory system connectable to a processor and having one or more programmable operational characteristics, said characteristics being defined through configuration by said computer based on the type of said processor, wherein said system is connectable to said processor by a bus, said system comprising:
>
> > a main memory connected to said bus; and
> >
> > a cache connected to said bus;

26

> wherein a programmable operational characteristic of said system
> determines a type of data stored by said cache.

*Id.* at 1257.

The district court invalidated the patent under *Alice* at the pleading stage, finding "that the claims were directed to the 'abstract idea of categorical data storage,'" and that they contained no inventive concept because the claimed computer components (a main memory, a cache, bus, and processor) were all generic and conventional. *Id.* at 1257. The district court also determined that the claims' "programmable operational characteristic" did not provide an inventive concept, because it represented "generic concepts that determine the type of data to be stored by the cache, and the patent fail[ed] to explain the mechanism for accomplishing the result." *Id.*

The Federal Circuit reversed, however. It found that the claims, just as with the claims in *Enfish*, were not directed to an abstract idea; instead, the claims in *Visual Memory* were directed to "a technological improvement: an enhanced computer memory system." *Id.* at 1259. The *Visual Memory* Court came to this conclusion largely because of the specification's explanation that a memory system with programmable operational characteristics that were defined by the type of processor connected to that system provided multiple benefits not found in other known systems at the time of patenting. *Id.* at 1259-60. Thus, because the specification "discuss[ed] the advantages offered by the technological improvement" set out in the claims, *Visual Memory* was not a case involving "'a purely conventional computer implementation of a mathematical formula,' or 'generalized steps to be performed on a computer using conventional computer activity.'" *Id.* at 1260 (citations omitted).

In coming to its ultimate conclusion, the Federal Circuit disagreed with the notion that the

claims should fail the *Alice* test because the "'programmable operational characteristic'" called out in the claims was a "purely functional feature[.]" *Id.* The Court noted that even representative claim 1 of the patent required more than just that feature—it also called for the use of a memory system with a main memory and a cache memory, where the memory system was configured by a computer to store certain data based on the type of processor used. *Id.* And the *Visual Memory* Court also rejected the argument that the claims should fail because the "programmable operational characteristic" was "'nothing more than a black box[,]'" or because the patent did not describe "'how to implement'" that characteristic (e.g., by supplying an innovative programming effort). *Id.* at 1260-61. The *Visual Memory* Court concluded instead, *inter alia*, that: (1) whether the patent sufficiently teaches a skilled artisan how to implement the claimed invention presents an enablement issue under 35 U.S.C. § 112, not an eligibility issue under Section 101; and (2) the claimed invention was not in the *programming* required for a computer to configure the programmable operational characteristic, but instead simply in the creation of a memory system that is configured based on the type of processor used. *Id.* at 1261.

Here, although the Court addresses the Section 101 question at step two (not at step one as did the *Visual Memory* Court), it agrees with M2M that the outcome in *Visual Memory* suggests that the instant Motion should be denied. As in *Visual Memory*, here there is indication in the specification (sufficient, at this stage, to plausibly suggest patent eligibility) that the consumer usage information solution *was* a technological improvement—one that provides for an enhanced, non-conventional m2m communications system. (Tr. at 76) And although the claims here do not contain much detail regarding *how* the server is to be specifically programmed to implement the consumer usage information solution, it may be (as was the case in *Visual*

28

*Memory*) that such specific programming is not the technological improvement at issue in the patent. It may be instead that the necessary innovation is simply in the creation of an m2m communications system that uses consumer usage information to modify stored data on consumer device assets. (*Id.* (M2M's counsel at oral argument asserting that in *Visual Memory*, as to the technical improvement at issue, there was "zero level of description of how the function was achieved or what programming instructions needed to be used" and yet the claims were deemed patent eligible))[12]

_____

[12]     The Court also briefly addresses two other cases upon which Amazon placed substantial reliance in its briefing:  *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) and *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266 (Fed. Cir. 2016). In *Electric Power*, the representative claim at issue was for "[a] method of detecting events on an interconnected electric power grid in real time over a wide area and automatically analyzing the events on the interconnected electric power grid[.]" *Electric Power*, 830 F.3d at 1351. The Federal Circuit, after finding that the claims were directed to the abstract idea of "collecting information, analyzing it, and displaying certain results of the collection and analysis[,]" went on to find no inventive concept, noting that "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate [the claims] from ordinary mental processes," which are excluded from patenting under Section 101. *Id.* at 1353-55. Additionally, the *Electric Power* Court noted that the claims "d[id] not even require a new source or type of information, or new techniques for analyzing it" and thus did "not require an arguably inventive set of components or methods, such as measurement devices or techniques, that would generate new data." *Id.* at 1355. But *Electric Power* was decided at the summary judgment stage, *id.* at 1351, not at the pleading stage (where the parties are here). And here, there is still a fact dispute about whether the consumer usage information solution amounts to the utilization of a "new technique" for analyzing and modifying data in the course of m2m communications. As for *Affinity Labs*, unlike *Electric Power*, it *was* a case decided at the Rule 12 stage. *See Affinity Labs*, 838 F.3d at 1268. The representative claim at issue there was for "a network-based media system with a customized user interface, in which the system deliver[ed] streaming content from a network-based resource upon demand to a handheld wireless electronic device having a graphical user interface." *Affinity Labs*, 838 F.3d at 1267-68. The Federal Circuit ultimately found that the claims were directed to the abstract idea of "delivering user-selected media content to portable devices" and further found no inventive concept, explaining that the claims were "written in largely functional terms" that failed to "constitute a concrete application of the abstract idea" that would render the claims patent-eligible. *Id.* at 1269, 1271-72. Important to the *Affinity Labs* Court's decision was that the "only putatively narrowing limitation" in the claim—one that referred to a "'customized user

For these reasons, Defendant has not demonstrated as a matter of law that the claims at issue do not contain an inventive concept.

## IV.   CONCLUSION

The Court recommends that Defendant's Motions to Dismiss be DENIED, without prejudice to Defendant's ability to later renew a Section 101 challenge in the form of a summary judgment motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

---

interface'"—was described in the specification as something that could be customized "'in a plurality of ways[.]'" *Id.* at 1271-72. This all led to the conclusion that the limitation (and the claim in general) did not constitute a sufficiently concrete application of the abstract idea. *Id.* Here, however, the claims recite what the specification describes as an allegedly inventive component—the consumer usage information solution—which, according to the specification, appears not to have been utilized at the time of the patent application. And here, it does not seem as clear as it was in *Affinity Labs* that this solution could not be deemed sufficiently concrete to save the claims from ineligibility.

Dated:  December 11, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE